The next case on our calendar is Otis Daniel and the EEOC v. T&M Protection Resources. Thank you. Mr. Daniel, you have two minutes as a pro se plaintiff to argue your case. Then we'll hear from the EEOC on your behalf. Good morning, Justice of the Court. My name is Otis Daniel, and I'm the self-representing plaintiff appellant in this case. As Justice Pula has just mentioned, I have two minutes. I've been allowed two minutes to present oral argument. Two minutes is not enough time for me to say what I would really like to say here today. For five years, for the past five years, I've had to at times shamefully defend who I am and what I am, as if who and what I am is a criminal. For the past five years, I have exhaustively argued and pleaded on the record and in my brief the facts in this case. I am tired of repeating those facts. It is too humiliating and hurtful for me to repeat much of those facts. The EEOC has chosen to participate in this case via its file amicus curiae brief. I am grateful for its legal contribution and support in this case. They, unlike myself, I believe, can best legally articulate the merits of my case. I was going to finish speaking here, but if I have time, I would just like to read something that I've mentioned on the record, a docket number 75, which I feel sums up what I've been arguing in my case for the past five years about the appellee. The appellee TNM management and our owners has over the years engaged in deliberately violating its employees' civil rights. These employees were mostly minorities and entry-level workers who work as security guards or fire safety directors. The management of TNM by their actions acted as though they are above the laws of the state of New York, New York City, and the federal government. TNM management failed to adhere to the company's own policies outlined in its employee handbook. TNM management knowingly and intentionally falsified company records, made false statements not only in this action in the district court, but also to the New York Division of Human Rights. TNM management owners has over the years taken advantage of the fact that employees like myself were employed at will. I will finish there. Mr. Daniel, excuse me, just two questions for you, please. Yeah, sure. So your statement that you just read, that has to do with how your former employer treats all its employees. Is that right? Most of its employees. I can speak from my own experience, yes, yes. And so was your treatment different from other employees or not? I can't speak for those other employees. While I was employed with the appellee, I did receive similar feedback from other workers that they were being mistreated, and I ultimately was the victim of that mistreatment. And my other question was, it appeared to me from looking at the record that the incident in which Mr. Meledone, I don't know how to say his name, he used a racial slur with you over the telephone. But that wasn't raised to the New York State Department of Human Rights, nor to the EEOC. Is that correct? I can't recall if I had mentioned it with the EEOC, but at the time when I filled out the New York State Division of Human Rights complaint, I might not have mentioned it because it did not cross my mind. It just didn't cross your mind. But now that seems to be our focus here in the district courts, right? It does seem to be the court's focus. I was new at this type of matter. I was so taken aback by my employment termination that what I tend to complain about in the New York State Division of Human Rights complaint were the last few events that led up to my termination. Your termination followed your seeking delivery and receiving delivery of a BB gun at the- Well, that was the excuse that the appellee uses to justify- Did that not happen? It did happen. I admit that it did happen. But that wasn't a violation of the appellee's policy. At least, I didn't see it as a violation. Mr. Melendonez, before I was terminated, went around and asked my co-workers if they knew of anything that he can use to get me fired. And through him asking that of my co-workers, he found out that two months prior, I had received- Not directly, but I did receive a delivery of what I thought was a toy gun that was accepted by the building's messenger service, a supervisor in that messenger service. And I didn't think anything of it until I was terminated two months later. So that had occurred two months prior? Yes, it did. The delivery of the BB gun was in March. I was terminated in April. And also, to whom did you complain at the employer's place of business about Mr. Melendonez's treatment of you? During my employment, I noticed how other co-workers that attempted to complain or did complain, how they were treated by the company. They were immediately dismissed or terminated just for trying to complain about any sort of mistreatment by Mr. Melendonez. And ultimately, when I had enough of Mr. Melendonez's discriminatory, what I believe was his discriminatory, inappropriate conduct for a person of his position, when I tried to complain to the company, they had a hearing, they had a disciplinary hearing, in which I sat down with Mr. Melendonez, their in-house counsel, Mr. Steven Gutstein, and other senior management. There were, I think, three other, the human resource director, Ms. Tony Scarito. And I tried to convey to them how I was mistreated by Mr. Melendonez during my, or rather, his inappropriate conducts at the site during my employment. And after about an hour in that room of trying to complain about how I was, complain about Mr. Melendonez's conduct, and when I tried to bring up the racial slurs and his conduct, I was told to basically shut up. And when was it that you complained? During the, well, like, during the disciplinary hearing. The company had a disciplinary hearing on March, on May the 15th, I think it was. So this was before you were, right just before you disappeared. Shortly afterwards, I think two, two or three days afterwards, I received an email from there, from the police human resource director, and told. And over the course of your employment, was that the only time you complained, or was there another time you complained? I, well, I, I did try to complain to Mr. Melendonez's boss, Mr. Woods, Bill Woods, I think his name was. And he told me of the upcoming disciplinary hearing. So that was right around the same time? That was around the, roughly the same time, yes. But not during 2011? I could not, I could not have. I mean, I was new to the work, I was new to the job. And if I had voiced any sort of grievances earlier, Mr. Melendonez would have retaliated and had me terminated. And that's, you know, knowing that, I postponed going to the, to the upper management sooner. And eventually, when I did, you know, say enough is enough, and tried to complain to the, to the company's senior management and our owners, I was said, I was let go. And I felt that was, that was definitely wrong. Thank you. Thank you very much. We'll hear from the EEOC. You can lower that, there's a, there's, well, there's a button to your right. Terrific. May it please the Court, I'm Gail Coleman for the Equal Employment Opportunity Commission. The N-word, which is at issue in this case, is uniquely offensive, and I will not say it here in court. This word dredges up the entire history of racial discrimination in this country. It invokes slavery and lynchings. There is no word more odious in the English language. In Albert Roberts v. GGG Construction, this Court said that the one-time use of the N-word may be enough in certain circumstances to create a hostile work environment in violation of Title VII. If there had been a complaint right after the use of the N-word and Mr. Melodonis had been fired, would you still be taking the position that a hostile work environment had been created, making Mr. Daniel potentially susceptible of a damages award? Absolutely. So the mere use of the word by any person in the work environment, and I agree that this is an odious word with a terrible past, but I'm thinking from an employment point of view, an employer's point of view, without an opportunity to fire the person immediately who used the word, what's an employer to do? Well, that may go to employer liability for the hostile work environment. And the EEOC is not necessarily taking the position that no matter who says it, in no matter what context, there is a hostile work environment, and certainly this Court has had opinions saying co-worker use may not be enough. But under the facts of this case, where an employee's supervisor yells at him, that is enough. Here, the one-time use is enough if a jury finds that Mr. Daniel is credible and that it happened as he says it happened, and if the jury finds that he was subjectively offended. That should be enough. Under virtually identical facts, the Massachusetts Court of Appeals said that that is enough to create a hostile work environment, and the D.C. Circuit in Ayse Etto, the panel opinion said that kind of situation may be enough, and Judge Kavanaugh's concurrence said he was concurring under the understanding that it is enough. The fact that this statement happened outside the presence of others, which the appellee is emphasizing, does not mean that listening to that statement by your supervisor is not severe. There is no way to imagine that having your direct supervisor yell that at you, you effing N, does not permanently poison the work atmosphere. Had Mr. Daniel not been fired, then every future interaction he would have had with this supervisor would be tainted by that comment. The appellee is also arguing that we should give less credence to this because there is no corroboration. Now, we're on summary judgment. Corroboration may become relevant on remand at a trial when a jury has to decide credibility, but on summary judgment under this Court's opinion in Walsh, as long as a plaintiff's testimony is not speculative, if a plaintiff is testifying to facts, to competent summary judgment evidence, that is enough to survive summary judgment. Now, in this case, although the EEOC is arguing that the one-time use of the N-word was sufficient in itself to create an actionable hostile work environment, we cannot ignore the other conduct in this case. And the district court, although we are on summary judgment, did not look at the facts in the light most favorable to the plaintiff and, in fact, made inferences in favor of the defendant. The district court misunderstood the evidence, downplayed the frequency of the harassing conduct, and specifically because the appellee makes a point in its brief of saying that the EEOC has misrepresented the evidence, I'd like to say, first of all, that the EEOC was scrupulously accurate in its portrayal of the record evidence and has record cites for every fact, and specifically with regard to use of the word homo. The testimony shows that every time Mr. Malonides said, Manny the homo, he also would lean into Mr. Daniels and whisper in his ear, homo, and that that happened two or three times a week every week when they worked together on the day shift. And you can find that evidence at Mr. Daniels' deposition, pages 231 to 33, 242, and 244. The district court also ignored facially neutral remarks, but when made by the same harasser who has evidenced a pattern of discrimination, under Cater it is a reasonable inference that those neutral remarks also were motivated by a discriminatory animus. The fact that some of those neutral remarks were made to Mr. Daniels' coworkers is not dispositive of whether or not there was discriminatory animus. We know that the supervisor repeatedly targeted Mr. Daniels based on his protected characteristics, and we also know from the appellee's brief that 65 percent of his coworkers were also minorities. Therefore, it is entirely possible that in directing these facially neutral remarks to many coworkers, all of it was tainted by racial animus. Thank you. Is there some time for rebuttal? Yes, thank you. We have from T&M Protection Resources. Good morning, Your Honors. My name is Leonard Weintraub of Padawan Owen Weintraub, and we do represent the appellee T&M. I just want to address one of the things that Mr. Daniels stated about his attempts to complain to the company previously. I think some of the statements that he made are simply not in the record. They may be true, but they're just not in the record, and that was not what he said during his deposition. I think what's in the record is that he made an anonymous complaint at some point in time, but he didn't reference to whom he made that complaint nor what the subject matter of the complaint was. All he said was he did make an anonymous complaint about Mr. Milodonos, but nothing specific about any of the conduct that's alleged herein. And I think that's important because Mr. Milodonos worked on the day shift with Mr. Daniel for several months before they switched shifts. The last seven months of Mr. Daniels' employment, they worked different shifts, and the only thing in the record is that there were nine days where they potentially could have overlapped, where they might have even seen each other. So for the last seven months, there was virtually no interaction given the shifts that they worked. When did he make the call that counsel EEOC referred to that was so odious? Mr. Milodonos denies making that statement, so it's our position that it's an unconfirmed, uncorroborated call that Mr. Milodonos denies. It was alleged to have been made in May 2012, though, right? It was made- Right towards the end. It was towards the end of his employment, that's correct. It was several weeks before he was terminated. By telephone, so it didn't require them to be in the workplace at the same time. That's correct. It was by phone. And so that's important because, especially when the EEOC would like this court to make a determination that a single use of the N-word is by itself, standing alone, sufficient to form a pervasive and severe harassing discrimination. It was made by a supervisor. A supervisor to a supervisee, right? That's what they're- and we don't believe that that's sufficient because if you're looking at the factors that the courts typically consider, it was not in the presence of subordinates and there's no physical threat or intimidation. The presence of subordinates could increase the humiliation factor or could provide corroboration, but I'm not sure why the company could argue that it doesn't poison a relationship between two individuals for one to use that epithet towards another. Well, and it's our position that the one-time use of that is not sufficient, even by a supervisor, to permanently poison the working environment of the subordinate. And I think if you look at all of the Second Circuit cases where this issue has arisen, where the court has either not dismissed or granted summary judgment for the employer, there have been multiple incidents where there's been racial epithets used and usually corroborated and usually in conjunction with threats and intimidation. In one instance, the plaintiff's car was keyed and- Why wouldn't a jury be entitled to determine on this record that Mr. Daniel was telling the truth? Well, it's not an issue about whether or not he's telling the truth. You were focusing on corroboration or not. Well, I think it's one aspect that I think the court should consider, especially on the facts of this case, because, and I think as Your Honor pointed out in asking questions of Mr. Daniel, if he had raised this issue previously, there's a lot of different ways it could have played out. If he had complained to the company at the time any of the alleged conduct happened, the company could have taken steps to intervene, to corroborate. In many of the instances, the company, in some of the cases that we've all cited to, a complaint is made and the company investigates and determines that the statements were in fact made. And now the question is what to do about it. So Mr. Daniels, by not complaining to the company at the time, by not filing in his human rights division complaint at the time, he didn't bring this allegation until over a year after he was terminated. So that takes away from the company's ability to investigate and to deal with it. So now, and it puts this court and us in a very difficult position of a year after he's been terminated, now for the first time he's saying, by the way, while I was still employed, something happened. And it was unfortunate, and now I'd like redress. And so I think if you look at all of the cases where things occurred, that there's numerous incidents. It's not a single incident. And I think also the numerous incidents demonstrate hostility towards the plaintiff. And I don't think that, I think if you look at all of the comments that are made. You're saying there are numerous incidents that the plaintiff has alleged that demonstrate hostility towards him. That's what he's alleged. But for example, one of them is that you're not black. That Mr. Manola-Dona supposedly said. In the course of activities from 2011 through 2012. Correct. And presumably because of the way he speaks and the way he dresses. He says, you're not black. He also, about the election said, I assume you're voting for your man Obama. And when Mr. Manola-Dona tells him, I'm actually a Republican. Mr. Manola-Dona's response is actually quite interesting. He says, well then I guess you're all right after all. So that comment, I think is very telling. Because it demonstrates, so we're not trying to justify Mr. Manola-Dona's conduct. I think a lot of the things he said are racially insensitive. But racially insensitive does not equate with a hostile work environment. And the fact that he said, so I guess you're all right after all. I guess if you have true animus towards African Americans or a minority. You wouldn't make that statement that I guess you're all right after all. You're arguing that taken as a whole, this was not enough to demonstrate a hostile work environment. That's correct. And I think that if you do look at all of the circumstances that occurred. 35%, the record is, there's no dispute about the record. 35% of the workforce is white. 35% African American. The rest is minority. And there's not a single allegation that any other complaint was made against Mr. Manola-Dona's. Mr. Daniel did not make any claim that everyone except the white people were discriminated against. Were treated harshly. Basically he acknowledged that Mr. Manola-Dona's was a jerk to everyone. He was not a nice man. And he didn't treat people well in general. And he did not, and he acknowledged in his deposition that he essentially was treated just like everybody else. He didn't say I was treated just as the other minorities. He said I was treated as everyone else. And I think that's why there's an insufficient basis to allow the claim of a single incident, essentially, where I think Mr. Manola-Dona's did cross the line with Mr. Daniel. I don't think that you can get to a discriminatory and harassing and hostile work environment based upon that. Thank you. Ms. Goldman, you reserve three minutes for rebuttal. I know you're here because of the odious remark, as you called it. Do you take a position on whether Mr. Daniel should have complained contemporaneously? We don't take a position on whether he should have complained, but I would like to say that whether or not he complained would not eliminate. A lack of complaint doesn't mean there is no hostile work environment. Here it would go to his credibility on remand, maybe whether he was actually subjectively offended. But a lack of complaint would play into the employer's defense under Farragher. If there was, in fact, a hostile work environment created by a supervisor, the employer has a defense under which it has to show that it had a reasonable complaint mechanism and also that the employee unreasonably failed to complain. Now, here Mr. Daniel has testified that he was aware of other employees who had complained and were fired. So I think that also would be a jury question about whether even if he didn't complain, it was perhaps reasonable under these facts for him not to, to be afraid to. I would also like to add two things. Although we do believe that the one-time use of the N-word is self-sufficient in this case, assuming that a jury believes that it happened and that Mr. Daniel was subjectively offended, there is a slew of other evidence backing it up. And as in Boyer-Liberto in the Fourth Circuit, where the Court said the two-time use of the term porch monkey by itself would be sufficient, but on remand the jury can consider everything in addition to it. Here, in addition to all the other conduct, I'd like to emphasize that there's an allegation that Mr. Daniel, a gorilla, another truly odious form of discrimination. Harassment by a supervisor is more hostile than harassment by a co-worker. And with respect to the fact that after seven or eight months, he and Mr. Melodonis were no longer working the same shift. I would like to say that there is testimony that still, even after Mr. Melodonis moved to the night shift, he still had personal contact with Mr. Melodonis at least ten times, which is more than once a month, because he worked double shifts sometimes, and because Melodonis would stay late sometimes. And it was when he stayed late and they overlapped that Mr. Melodonis would go into the locker room, watch him, and make inappropriate comments. Also, during this period of time, they had phone contact and e-mail contact. It was by phone that Mr. Melodonis called him up while he was working the night shift and said the Mary Poppins comment, and certainly it was by phone that he then made the N-word comment. Additionally, while Mr. Daniel was working the night shift, Mr. Melodonis repeatedly called on his co-workers to check on his whereabouts, which Mr. Daniel testified to him meant that he was being checked up on. He was the black man in an apartment or in a building with a lot of wealthy tenants. And what was this black man doing? Where is he? I see that my time is up. Thank you very much. Thank you all. We'll reserve decision.